## In re MERZ.

## BOYD v. MERZ.

### No. 57.

Circuit Court of Appeals, Second Circuit.
Dec. 1, 1930.

See, also, 37 F.(2d) 1.

Robert P. Levis, of New York City, for appellant Walter Merz.

Davis W. Kahn, of New York City, for appellee Melville Boyd, as trustee in bankruptcy.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Franz Merz, who carried on business under the trade-name of the Merz Worsted Mills, with a factory in Philadelphia, and a sales office in New York, was adjudicated a bankrupt in 1927. The bankrupt's son, Walter Merz, helped him with office details and to some extent with sales of merchandise. Upon the return of the son from the war, his father said: "Son, here is a gift of $7,500." The mode of making the gift was by crediting on the books of the Merz Worsted Mills an advance by Franz Merz to C. A. Auffmordt & Co., the factors of the mills. In addition to this credit on the books to Walter Merz, there were also credited to him various bonuses as well as interest on the account; these items aggregating, with the $7,500, a total of $51,791.06. There were withdrawals of cash and other debits to the account amounting to $19,468.12, so that the balance standing in favor of Walter Merz was $32,322.94, for which he filed a claim in bankruptcy for money loaned.

The salary of Walter Merz, according to his testimony, was from $3,500 to $6,000 per annum. He said that his father at some time during his employment said: " * * * If you have a good year, * * * at the end of the year I will take care of you and give you a certain amount." But he more than once stated in his testimony that the whole matter was "discretionary" on his father's part, and that the latter decided the amount to be allowed after the work was completed.

The referee was of the opinion that the credit of $7,500 represented an uncompleted gift. But, as the withdrawals by Walter Merz amounting to $19,468.12 were first applicable to this credit because it was the earliest in the account, the referee held that the attempted gift of $7,500 was consummated by delivery. He further held that the credits for bonuses represented compensation for extra services, and accordingly denied the motion by the trustee to expunge the claim of Walter Merz, and sustained it as filed. The matter thereafter came before Judge Coleman on petition to review. He held that the bonuses were mere gratuities, and expunged the claim by an order, from which this appeal is taken.

The chief question is whether the credits for extra compensation or so-called bonuses were made because of a promise to pay given by the bankrupt before the work of Walter Merz commenced in June, 1919, and the answer to it requires some analysis of the testimony. If they were made because of such a promise, there might be ground for saying that there was a right to recover the reasonable value of the services rendered even though the promise was to pay an unascertained amount. Under such circumstances it might be said that the claims became fixed when the credits were entered in the books and, at any rate, after an account between the parties was stated. Varney v. Ditmars, 217 N. Y. 223, 111 N. E. 822, Ann. Cas. 1916B, 758; Von Reitzenstein v. Tomlinson, 249 N. Y. 60, 162 N. E. 584. But we regard the proof of any promise to pay extra compensation made before the work was begun as entirely insufficient.

The testimony as to an agreement for extra compensation consists entirely of statements by Walter Merz. The first mention in the testimony of any action of the father in respect to the bonuses was in answer to a question as to what Franz Merz said on March 31, 1920, when credits for bonuses aggregating $18,668.67 and $1,604.27 were placed to Walter's account. The latter testified that his father then said to him: "Well, I will give you a certain per cent. of the net sales and it comes to that figure."

On being further asked whether his father told him on what percentage he was fig-

uring this bonus, he replied: "No, that was discretionary on his part; he decided the amount at the end of the year. We were working very hard and it was an exceptionally good year." Walter was then asked how long a period the foregoing bonus was supposed to cover, and replied that it was as long as he had been in the business. He was further asked whether the bonus was for the year or for the period he had been with his father, and he answered that that was "discretionary" with his father. Later, in reply to a question whether there had been any discussion about additional compensation prior to March 31, 1920, Walter said: "Well, it was discretionary on his part, but he told me, well, if you have a good year, boys, at the end of the year I will take care of you and give you a certain amount." He said he did not remember the date of this conversation, but, on being pressed for the date, stated that it was "about at the start." He further said, "There are so many dates, I get all balled up," and added, in response to another question respecting what his father had said about the bonus of $18,668.67, "Well, he said, you have done very well this year, here is a bonus, so much, a certain percentage of sales."

As to the $10,000 item credited on May 31, 1920, Walter testified that his father said: "In consideration of the good work we have done, he said, boys, I think you are entitled to this amount of money."

There could not be the slightest basis for a claim that the foregoing credits were set up in response to an agreement for extra compensation, were it not for the single item of testimony by Walter Merz that his father said "about at the start": " * * * If you have a good year, boys, at the end of the year I will take care of you and give you a certain amount."

But the circumstances under which the credits were set up must be remembered. The claimant was a son of the bankrupt. His account starts with a credit of $7,500, which was admittedly a gift. His regular salary at most was only $6,000 per annum, and the supposed promise of the father to give further compensation only purported to take care of the "boys at the end of the year." Yet the credits were at all sorts of odd times, and before Walter had been with his father for a year his own had reached the total of $29,272.94, a sum so disproportionate to his salary that it would be a most unusual bonus. Moreover, the net credits to Walter Merz on the books, together with credits to other members of his family, were set forth in an agreement with the father dated May 22, 1925, which recited that the father "from time to time in the past * * * made gifts" to them and placed to their credit those "sums of money on his books." Trustee's Exhibit 1. This agreement provided that the persons holding the credits should loan to Franz Merz the amounts standing to their credit during the term of his life and for eight years after his death. We think that it cannot reasonably be supposed that Walter Merz would sign an agreement reciting that credits corresponding substantially in amount with his claim had been made as "gifts" if they had really represented compensation promised to induce him to perform services. It is also to be borne in mind that Walter Merz at first testified that his father set up the credit of $18,668.67 on March 31, 1919, with the statement, "I will give you a certain per cent of the net sales and it comes to that figure," and that later, in three places in his testimony, he spoke of his father's action in the matter of bonuses as "discretionary," and said that he was "all balled up about dates." He at first gave no testimony about a promise by his father "about at the start" to allow extra compensation. It was only later that he testified that his father told his sons, "If you have a good year, boys, at the end of the year I will take care of you and give you a certain amount," adding that he did not remember the date when this promise was made. It was only when interrogated by his own counsel that he fixed the time as "at the start." We cannot regard this statement of an interested party, made about ten years after the event, as proof that the credits represented more than mere gratuities. If it could be thought that the words, "If you have a good year, boys, at the end of the year I will take care of you and give you a certain amount," might, when standing alone, even though uttered by a father to a son, be sufficient basis for implying a promise to pay in exchange for services to be rendered, they certainly ought to have no weight in view of the remaining testimony in which nothing but payments for antecedent services is suggested, and particularly in view of Exhibit 1, supra, which recited that the credits were gifts, and of the exaggerated amount of the credits as compared with the fixed salary of Walter Merz. We can feel no doubt that the credits to Walter Merz, with the exception of interest items, represented attempted gifts by the father to the son. This is true of the $7,500 credit which admittedly represented a

gift, as well as of all the credits for extra compensation.

It is argued that the $7,500 credit was a consummated gift because the father drew his check to make an advance to Auffmordt & Co. and entered $7,500 thereof on his books as a credit to the son. It is said that the drawing of the check in some way amounted to a symbolical delivery of the credit to the son. By what process of reasoning such a conclusion is reached we cannot understand, nor can we see how such a transaction, unknown so far as the record shows to Auffmordt & Co., differs from the mere opening of a credit to the son in a case where no check was drawn at all. The precedents relied on by the creditor do not bear out his claim. The decision in Matter of Mills, 172 App. Div. 530, 158 N. Y. S. 1100, affirmed, 219 N. Y. 642, 114 N. E. 1072, is chiefly relied on, but it is in fact directly opposed to the creditor's position. There Ogden Mills sought to make a gift of $2,000,000 to his two children. He proposed to make the gift substantially in stock which was already in the possession of his son and was valued at $1,984,000. The donor's bookkeeper was directed to credit the children with the $2,000,000 on the donor's books and to charge them with the stock valued at $1,984,000. It was held that the gift of the stock, control of which was no longer with the donor, was valid, but that the credit was an insufficient means of making a gift of the cash balance of $16,000. In Matter of Cohn, 187 App. Div. 392, 176 N. Y. S. 225, also relied on by the claimant, the donor made a gift of stock standing in the name of his firm by delivering a signed instrument of gift to his wife in these words: "I give this day to my wife * * * five hundred shares of American Sumatra Tobacco Company common stock." The gift was sustained by a divided court upon the ground that the instrument of gift, even though not in the form of a deed as in Matson v. Abbey, 141 N. Y. 179, 36 N. E. 11, or of an assignment, amounted to a symbolical delivery.

Mr. Williston in his book on Contracts, § 440, says, as to intangibles: "Unless a chose in action has such tangible form as to induce the law to regard it as in the nature of chattel property * * * no effective gift of it can be made without a deed."

In New York the rigor of this rule has at most been ameliorated only to the extent that an instrument containing words of gift has been held sufficient though not in form a deed or assignment.

In Matter of Dougherty v. Salt, 227 N. Y. 200, 125 N. E. 94, the note of the donor in the hands of the donee, but made without consideration, was held to represent an unenforceable claim. See, also, Harris v. Clark, 3 N. Y. 93, 51 Am. Dec. 352. In Cook v. Lum, 55 N. J. Law, 373, 26 A. 803, A deposited moneys with B. A had a strip of paper containing a column of figures made by B, the sum total of which represented the aggregate of indebtedness. A, by oral statements, and a delivery of the slip of paper to C, attempted to make a gift of the deposits with B. It was held that C had no right to the claim as against B's administrator. Matter of Mills, supra, is a decision directly supporting the position of the trustee in bankruptcy.

Under the authorities, we think the book entries consummated no gift either of the $7,500 or of the items constituting the so-called extra compensation or bonus. The mere credit to the son on the father's books still left the payment of all the items within the father's control. But it can in fact make no difference whether the credit of $7,500 was enforceable or not, for the withdrawals which were more than enough to exhaust this item should be allocated to it, because it stands as the earliest credit. By debits based on these withdrawals, it was extinguished as a claim, and the gift was by this means consummated. Clayton's Case, 1 Merivale, 572. While the doctrine of Clayton's Case normally applies to enforceable claims, there can be no reason why it should not equally apply to unenforceable credits of equal rank. As the creditor's claim is for a balance, it can make no difference against which credits the withdrawals in fact are charged.

It is further contended that statements of account were rendered to Walter Merz, and that by this means the indebtedness to the latter was finally adjusted. But an account stated can only determine the amount of indebtedness where a liability exists. Stocking v. Seed Filter & Mfg. Co., Inc., 175 App. Div. 812, 162 N. Y. S. 451; Burroughs Adding Machine Co. v. Hosack, 224 App. Div. 583, 231 N. Y. S. 457. In Rodkinson v. Haecker, 248 N. Y. 480, 162 N. E. 493, there was a valid claim. The dispute only related to the amount. It was held that the amount became fixed by an account stated received and retained without objection, which "is conclusive upon the parties unless fraud, mistake or other equitable considerations are

shown which make it improper to be enforced."

Here no liability existed, so that the statements of account had no bearing on the rights of the parties.

The order of the District Court is affirmed.