# KRAUSS BROS. LUMBER CO. *v.* DIMON STEAMSHIP CORP.

No. 4.   Argued October 10, 11, 1933.—Decided November 13, 1933.

*Mr. Lane Summers,* with whom *Messrs. W. H. Hayden* and *F. T. Merritt* were on the brief, for petitioner.

118

*Mr. Claude E. Wakefield,* with whom *Mr. Cassius E. Gates* was on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

This suit in admiralty was brought by petitioner in the District Court for Western Washington against respondent, the steamship " Pacific Cedar," and its owner, the respondent Dimon Steamship Corporation, to recover an alleged overpayment of freight and to establish a lien on the vessel for the amount of the overpayment. The libel alleges a contract by petitioner with the owner, by which the latter agreed to receive for loading on the " Pacific Cedar," on or about January 18, 1930, at named Pacific Coast ports, a quantity of lumber, and to transport it to Philadelphia and New York at the rate of $10.00 per thousand feet, but with a provision that in the event " a regular intercoastal carrier moves similar cargo at a lower rate," such lower rate should be applied. The libel makes no reference to any bill of lading but sets up that the lumber was shipped and transported, and between March 1st and 20th was delivered, all under the provisions of the contract, and that at the conclusion of the voyage and while the vessel was discharging her cargo, respondents, at destination, demanded and received payment of freight at the $10.00 rate, although in January, 1930, a regular intercoastal carrier had carried a similar cargo from Seattle to Baltimore at $8.50 per thousand feet.

The lien asserted is for the difference between the freight paid and the freight earned at the agreed lower rate. Upon exceptions the District Court dismissed the libel for want of admiralty jurisdiction. 53 F. (2d) 492.

The Court of Appeals for the Ninth Circuit reversed the decree dismissing the libel *in personam,* but affirmed so much of it as dismissed the libel *in rem.* 61 F. (2d) 187. This Court granted certiorari on petition of the libellant alone, 289 U.S. 716, to resolve an alleged conflict between the decision below and that of the Court of Appeals for the Sixth Circuit in *The Oregon,* 55 Fed. 666, 676. The only question presented here is whether the petitioner is-entitled to a lien on the vessel for the overpaid freight.

While there has been a lack of unanimity in the decisions as to the precise limits of the lien in favor of the cargo, see *Osaka Shosen Kaisha* v. *Pacific Export Lumber Co.,* 260 U.S. 490, the cases are agreed that the right to the lien has its source in the contract of affreightment and that the lien itself is justified as a means by which the vessel, treated as a personality or as impliedly hypothecated to secure the performance of the contract, is made answerable for nonperformance. See *The Freeman,* 18 How. 182, 188; *Vandewater* v. *Mills,* 19 How. 82, 90; *Osaka Shosen Kaisha* v. *Pacific Export Lumber Co., supra; The Flash,* 1 Abb. Adm. 67; *The Rebecca,* 1 Ware 187; *Scott* v. *The Ira Chaffee,* 2 Fed. 401. This engagement of the vessel, or its hypothecation, as distinguished from the personal obligation of the owner, does not ensue upon the mere execution of the contract for transportation. Only upon the lading of the vessel, or at least when she is ready to receive the cargo—where there is " union of ship and cargo "—does the contract become the contract of the vessel and the right to the lien attach. No lien for breach of the contract to carry results from failure of the vessel to receive and load the cargo or a part of it. See *Osaka Shosen Kaisha* v. *Pacific Export Lumber Co., supra.*

It is not questioned here that the union of ship and cargo, once established, gives rise to the right of the vessel to a lien on the cargo for the freight money and of the

cargo on the vessel for failure to carry safely and deliver rightly. The breach now alleged is only that the freight demanded on discharge of the cargo was in excess of that stipulated by the contract, and respondent insists that the liens in favor of cargo growing out of the contract of affreightment are restricted to those claims founded on breach of the obligation to carry and deliver. But the undertaking to charge the agreed freight and no more is an inseparable incident to every contract of affreightment, as essential to it and as properly a subject of admiralty jurisdiction as is the obligation of the cargo to pay freight when earned, or of the vessel to carry safely. See *Matson Navigation Co.* v. *United States*, 284 U.S. 352, 358. It is unlike an agreement to pay a commission to the broker procuring the charter party, *Brown* v. *West Hartlepool Steam Navigation Co.*, 112 Fed. 1018, or a provision for storing cargo in the vessel at the end of the voyage, *Pillsbury Flour Mills Co.* v. *Interlake Steamship Co.*, 40 F. (2d) 439, which, though embodied in the contract of carriage for hire, are no necessary part of it.

It is not denied, and the cases hold, that there is a lien for excessive freight knowingly exacted as a condition of delivery of the cargo, *The John Francis*, 184 Fed. 746; *The Ada*, 233 Fed. 325; *The Muskegon*, 10 F. (2d) 817; *Tatsuuma Kisen Kabushiki Kaisha* v. *Robert Dollar Co.*, 31 F. (2d) 401; cf. *The Oregon*, 55 Fed. 666, 677; but it is argued that in that case the generating source of the right is the failure to perform the transportation contract by refusal to deliver the cargo. The fact that the breach of one term of the contract, the agreement to charge only the stipulated freight, coincides with the breach of another, to make delivery, does not obscure the fact that both terms are broken, and that the substance of the right to recover is for the freight collected in excess of that agreed upon, not damages for failure to make delivery. Nor does the fact that there is breach of both afford any

basis for saying that the breach of either term alone could not give rise to the lien. This becomes more apparent upon examination of the numerous cases in which a lien has been imposed for some breach of the freight term.[1]

In *The Oregon, supra,* the time charterer sold the tonnage of the vessel for a single voyage at a rate in advance of that stipulated in the charter party. Her captain collected the freight at the agreed higher rate and retained it. The Court of Appeals for the Sixth Circuit, Judge Taft writing the opinion, sustained the jurisdiction *in rem* to recover the excess on the ground that its collection was incidental to the execution of the maritime contract, and to be treated as an overpayment of freight. This

---

[1] Lien for freight paid in advance but not earned under the terms of the contract of affreightment: *The Harriman,* 9 Wall. 161; *The Panama,* 18 Fed. Cas., No. 10703; cf. *The A. M. Bliss,* 1 Fed. Cas., No. 274; *Church* v. *Shelton,* 5 Fed. Cas., No. 2714. (See also *Allanwilde Transportation Corp.* v. *Vacuum Oil Co.,* 248 U.S. 377, and *International Paper Co.* v. *The Gracie D. Chambers,* 248 U.S. 387, where the lien was denied because the freight was held to have been earned.) Lien for charges or purchase price of the cargo, collected by the master from the consignee for account of the shipper as provided in the contract of affreightment: *The Hardy,* 11 Fed. Cas., No. 6056; *The St. Joseph,* 21 Fed. Cas., No. 12230; *Zollinger* v. *The Emma,* 30 Fed. Cas., No. 18218; cf. *The New Hampshire,* 21 Fed. 924; *Krohn* v. *The Julia,* 37 Fed. 369. Lien in favor of the charterer for freight earned in violation of the charter party by the ship manned and officered by the owner; *The Port Adelaide,* 59 Fed. 174. Lien for freight overpaid, as dead freight for shortage of cargo, wrongfully exacted by threat of attachment of the cargo actually shipped and delivered according to the contract: *The Lake Eckhart,* 31 F. (2d) 804. Lien for salvage, payment of which by the cargo was fraudulently procured by the master, who had wilfully stranded the vessel: *Church* v. *Shelton, supra.* Lien for the excess of a deposit by the cargo owner in a general average fund, the right of recovery being founded on the master's duty, and hence the ship's, to make the general average adjustment: *The Emilia S. de Perez,* 22 F. (2d) 585.

conclusion is obviously inconsistent with the view that the affreightment lien in favor of the cargo is dependent on the failure of the vessel to carry and deliver. The right to a lien for the mistaken overpayment of freight was involved in *The Oceano,* 148 Fed. 131, where the charterer advanced charter freight to provide a fund for the vessel's disbursements, under stipulation that the advance should be deducted from the freight earned under the charter party. Upon settlement at the port of destination the libellant's agent, by mistake, deducted less than the advances made. The court, Judge Hough writing the opinion, held, treating the settlement as an overpayment of the charter freight, that the cause was one of affreightment and that a lien attached to the vessel for the amount of the overpayment.

It was argued to us, as it has been in other cases, that, as the payment for excess freight was made under mistake, the demand is upon a cause of action for money had and received, which lies only at common law and not in admiralty. The objection applies with equal force to the liens allowed for excess freight, payment of which was procured by fraud or duress, or for freight paid in advance where the voyage was abandoned after the ship was loaded.[2] Admiralty is not concerned with the form of the action, but with its substance. Even under the common law form of action for money had and received there could be no recovery without proof of the breach of the contract involved in demanding the payment, and the basis of recovery there, as in admiralty, is the violation of some term of the contract of affreightment, whether by failure to carry or by exaction of freight which the contract did not authorize. See *The Oceano, supra,* 132; but cf. *Israel* v. *Moore & McCormack Co.,* 295 Fed. 919.

[2] See note 1, *supra.*

It seems equally obvious that lack of knowledge by the parties at the time of the payment that the freight demanded was excessive should have no bearing on the existence of the lien. There is no hint in the books that the security given by way of lien for the performance of the contract of affreightment depends upon such knowledge. The liability of the vessel for damage to cargo affords a not infrequent example of a lien which may attach, although at the time of unloading cargo there was no knowledge of the particular events which effected the breach. See *Rich* v. *Lambert,* 12 How. 347.

We see no distinction, either in principle or with respect to the practical operation or convenience of maritime commerce, between the lien asserted here for overpayment of freight by mistake and those for overpayments similarly made but induced by other means. Here, as there, the overpayment, made as the cargo was unloaded, occurred while the union of ship and cargo continued, and the liability asserted was determined by events contemporaneous with that union. The circumstances which called the lien into being do not differ in point of notoriety from those giving rise to other affreightment liens upon the vessel. While it is true that the maritime lien is secret, hence is *stricti juris* and not to be extended by implication, this does not mean that the right to the lien is not to be recognized and upheld, when within accepted supporting principles, merely because the circumstances which call for its recognition are unusual or infrequent.

The suggestion made on the argument that the lien asserted here, after the cargo is discharged, is affected by application of the often stated rule that the liens on ship and cargo are mutual and reciprocal, is without basis. It is only the obligations of ship and cargo under the contract of affreightment which are to be characterized as mutual and reciprocal, not the liens which result from the

breach of those obligations. The one lien may come into existence without the other and the lien on the ship in favor of cargo, not being possessory, see *Dupont de Nemours & Co.* v. *Vance,* 19 How. 162; *Tatsuuma Kisen Kabushiki Kaisha* v. *Robert Dollar Co., supra,* may survive the lien of ship on cargo which is terminated by unconditional delivery.[3] *4885 Bags of Linseed,* 1 Black 108.

We note, but do not discuss, the objection that the libel may be taken to allege only a voluntary overpayment of the freight without mistake. We think it may be construed to mean that the payment was made without knowledge at the time that a lower rate controlled. The court below took that to be its meaning. Certiorari was granted to review the question decided below and not the sufficiency of the pleadings to raise it.

*Reversed.*

MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND, MR. JUSTICE BUTLER and MR. JUSTICE ROBERTS are of opinion that the challenged judgment should be affirmed.

Secret liens are not favored, they should not be extended by construction, analogy or inference, or to circumstances where there is ground for serious doubt. *Osaka Shosen Kaisha* v. *Pacific Export Lumber Co.,* 260 U.S. 490.

---

[3] The statement that liens of affreightment on ship and cargo are mutual and reciprocal is based on the frequently quoted phrase of Cleirac (597) : " Le batel est obligé à la marchandise et la marchandise au batel." Judge Hough indicated in *The Saturnus,* 250 Fed. 407, 412, that Cleirac's " clever phrase " referred to the mutual obligations flowing from the union of the personified ship and personified cargo.

It has often been pointed out that the lien on cargo is not strictly a privilege (see Pothier, Maritime Contract, Translation by Caleb Cushing, Boston, 1821, 94–50; Hennebicq, Principes de droit Mari-

time, Brussels, 1904, 316) as is the lien on the ship, but is more like the possessory lien of the land carrier and, like it, does not survive the unconditional delivery of the cargo. See *Cutler* v. *Rae*, 7 How. 729; *4885 Bags of Linseed*, 1 Black 108, 113; *The Bird of Paradise*, 5 Wall. 545; *The Eddy*, 5 Wall. 481, 494, and the full discussion in *Wellman* v. *Morse*, 76 Fed. 573.