John MORRISEY et al., Libelants,

v.

S.S. A & J FAITH, Respondent.

No. A 64-27.

United States District Court
N. D. Ohio, E. D.

Dec. 4, 1964.

Thomas O. Murphy, Johnson, Branand & Jaeger, Cleveland, Ohio, for libelants.

Robert Preston, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for respondent, Grace Lines, Ltd.

CONNELL, Chief Judge.

In the latter part of May, 1964, the S.S. A & J Faith listed into the port of Cleveland, where the financial troubles which had been threatening her finally culminated in her seizure. Absolutely abandoned by her owners and deservedly deserted by an unpaid and unfed crew,

the vessel was arrested by the Marshal on May 29, 1964, after a libel had been filed on behalf of Lederer Terminal Warehouse Company. Subsequently a total of 41 libels were filed against her. To expedite what would have been a cumbersome situation, we ordered that all libels be consolidated under one action (John Morrisey, et al. v. S.S. A & J Faith, A 64–27). It was further ordered that J. Harold Traverse, Esquire, be appointed as Master Commissioner to assist the Court in determining the validity and priority of the respective liens against the vessel.

After the arrest and seizure of the vessel, no bond was posted for her safe return. It is significant that the owners, Pacific Seafarers, Inc., were then embroiled in bankruptcy proceedings in the Southern District of New York. After several libels were in default, and it became apparent that no appearance would be made on behalf of the vessel by the owners, on June 29, 1964, we ordered that the vessel should be sold after due notice, and we authorized the Marshal to receive bids. The public notice, in part, read:

> "Each bid submitted must designate whether the bidder will: (A) Assume the obligation of handling all cargo aboard the said vessel in accordance with the directions of the owners of said cargo, and/or (B) require all cargo to be unloaded prior to delivery of the vessel without cost to the bidder."

The Respondent, Grace Lines, Ltd., submitted the two highest bids—one for $425,000, whereby they would have required all cargo to be unloaded without cost to them, and one bid for $350,000, whereby they would assume the obligation and the cost of discharging all cargo. Inasmuch as the unofficial estimate of the cost of unloading ranged from $80,000 to $100,000, it was determined that the latter bid of $350,000 was the higher of the two. The sale for $350,000 was ratified and confirmed by order of this Court on August 3, 1964. Thereafter Grace Lines, Ltd. completed the voyage and received the freights which are the subject of the petitioner's present request. Several stevedoring companies and suppliers who furnished services to the Faith before she arrived in Cleveland have joined in this motion to compel Grace Lines to pay into the Registry the freights which the voyage produced.

At the risk of over-simplification, we may summarize the position of the parties in this manner: The Respondent resists the motion with the contention that the freights of a ship are an inseparable incident of the ship so that a libel against the freights is actually a libel against the ship, and all liens against the ship are discharged by the judicial sale. Petitioners respond by denying that they assert a new lien against the vessel, but are merely trying to secure as part of the fund which has replaced the ship that portion of the freights which was earned prior to the sale.

■ Addressing our attention to the limited volume of authority on this point, we are unable to find anything in the authorities cited by the petitioners which can lend comfort to their plight. It is beyond argument that the freights are incidental to and indistinguishable from the vessel. United States v. Robins Drydock & Repair Co., 13 F.2d 808 (1st Cir. 1926). Consequently, any lien against the freights must necessarily be predicated upon a lien against the vessel. In re North Atlantic & Gulf Steamship Co., 204 F.Supp. 899, 907 (S.D.N.Y. 1962); Marine Chartering Co. v. Schirmer Stevedoring Co., 194 F.Supp. 488 (N.D.Cal., S.Div.1961), rev'd in part on other grounds, aff'd on this point, 306 F.2d 188, 192 (9th Cir. 1962). And any lien against the vessel which arises out of services performed prior to a judicial sale must be addressed to the fund in the registry which that sale produced. As stated by the court in The Trenton, 4 F. 657 (E.D.Mich.1880):

> "In these cases of judicial sales *in rem* the liens of creditors are not extinguished, but are merely

transferred from the *res* itself to the fund in court."

But in so far as a prior lien is addressed to the vessel for satisfaction, it is extinguished by its judicial sale.

 It is so fundamental in admiralty law that a judicial sale cuts off all liens that the question has rarely been presented for a judicial answer. As stated in Gilmore & Black, The Law of Admiralty, at p. 641:

"Only the admiralty court acting *in rem* has the power to divest liens by a judicial sale. Here we touch the central point of our system of admiralty law. Here we should expect to find the winds of litigation at their most turbulent. But, just as at the eye of the hurricane the air is undisturbed, so here the law exists as in a vacuum, its purity undefiled by controversy and dispute. There are no cases—or almost none. There have never been any cases. Presumably there never will be any cases. There is only one doctrine.

"Any maritime lienor may have the ship arrested by filing a libel *in rem* in any district in which the ship is found. The marshal will then take the ship into custody. Notice of the libel is required to be given by publication and other claimants may intervene. If the ship is not released on a stipulation for value and if a judgment in favor of the original or any intervening libellant becomes final, the ship will be sold on order of the court. The effect of such a sale is to execute or divest all liens against the ship in the hands of the purchaser—not only all liens held by claimants who intervened in or had notice of the proceeding, but all liens everywhere. The execution of liens by judicial sale is given international recognition."

Despite the ancient origins of admiralty law and its long steady development, the search for certainty is often precarious. In a field of law bewildered by changing concepts of "unseaworthiness," "on navigable waters," etc. and constantly amended by the changing currents of thought on the part of our Supreme Court, there is at least one rule which is universally accepted: a judicial sale extinguishes prior liens against a vessel.

If there were any doubts about this ancient doctrine, they were effectively put to rest by Judge Brown in The Trenton:

"In short, the doctrine that the sale of a vessel by a court of competent jurisdiction discharges her from liens of every description, is the law of the civilized world."

 Thus, the respondents here must prevail because we conclude that the petitioners are attempting to assert a lien which has been extinguished in so far as the vessel is concerned by a judicial sale of that vessel. Petitioners in their reply brief have asserted that they merely wish to attach that portion of the freights which had been earned when the ship had been seized and which had thus been in the constructive possession of this Court during the period of seizure. This is no more than a semantic dodge to conceal the fact that the effect which the petitioners would have us accomplish is the same as allowing a lien to be executed upon a vessel after a judicial sale. We are still asked to compel a new owner to satisfy a claim which arose prior to his ownership and which he had the right to expect had been extinguished by that sale. This is wholly inconsonant with centuries of admiralty law.

The Motion is overruled.